**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

LATISSHA WILLIAMS,          )
                            )
        Plaintiff,          )
                            )
v.                          )          Case No. 1:17-CV-50
                            )
LINCOLN FINANCIAL GROUP,    )
                            )
        Defendant.          )

## OPINION AND ORDER

This matter is before the Court on the motion for summary judgment and memorandum in support filed by Defendant Lincoln Financial Group on January 22, 2018 (DE 27 and 28). Plaintiff Latissha Williams filed a response in opposition on April 26, 2018 (DE 34) and Lincoln fled a reply on May 10 (DE 35).[1] For the reasons set forth below, the motion is GRANTED.

## BACKGROUND

Latissha Williams filed this lawsuit against Lincoln, her former employer, on February 7, 2018. Complaint (DE 1). Williams claims that Lincoln discriminated against her in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*., by failing to provide her with an accommodation–in this case working from home or a remote location instead of at the office–due to her environmental allergies. Complaint, p. 2. Williams filed this lawsuit *pro se*, but eventually was able to obtain counsel, who entered appearances on Williams' behalf on March 15 and April 26 (DE 32, Notice of Appearance by Jon J. Olinger; DE 33, Notice of Appearance by James A. Hanson). Williams asserts that she suffered from environmental allergies, of an unknown

---

[1] The deadline for Williams to respond to the motion for summary judgment was extended to accommodate her efforts to obtain counsel.

etiology, while working in her office at Lincoln. She requested an accommodation to permit her to work from home or another remote location. Williams submitted documents from her physician stating that she suffered from this ailment and needed to work from home or some other location outside of Lincoln's offices. Lincoln considered Williams' request but denied it on the basis that the essential duties of her job had to be performed onsite. Williams ended up leaving her employment, claiming she was forced to resign when Lincoln refused to accommodate her by granting her request to work from home. Complaint, p. 2.

Williams' tenure at Lincoln began when she "was initially placed with Lincoln by a temporary employment agency in 2010." Defendant's Memorandum, p. 2 (citing Williams Depo., p. 16).[2] "In October 2013, Lincoln hired Plaintiff as a full-time employee in the Marketing Department in the position of Senior Service Representative. *Id*. (citing Williams Depo., pp. 16-17, 23-24). Williams' job duties "entered on preparing enrollment kits for employer retirement plans." *Id*. (citing Williams Depo., pp. 30-34). These enrollment kits contained various information about specific retirement plans, such as "when a customer's employee was able to enroll in the retirement plan, the percentage for matching contributions made by the employer, the amount the employee could invest in the plan, and contact information for the retirement

---

[2] The factual details of Williams' employment with Lincoln are taken from Lincoln's memorandum in support of its motion for summary judgment, since neither Williams' Complaint nor her response brief delve into these details. Regardless of how the facts enter the record, this Court must interpret them "in a light most favorable to the non-moving party and draw[] all reasonable inferences in favor of the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In any event, the facts recited in Lincoln's memorandum come directly from Williams' deposition and most–such as the dates of her employment and her job duties and responsibilities–are undisputed. What Williams disputes is Lincoln's contention that those duties and responsibilities could *only* be performed in the office as opposed to her home or another remote location.

plan." *Id*., p. 3. According to Lincoln, the process for compiling these enrollment kits, and

Williams' role in that process as a Senior Service Representative, went like this:

> [Williams] received information to include in the enrollment kits from Lincoln
> Account Managers, who in turn received the information from the Lincoln
> customers for whom Plaintiff was preparing enrollment kits. . . . Prior to sending
> the final version of the enrollment kit to customers, Plaintiff would provide the
> enrollment kit to another Senior Service Representative . . . for proofreading. . . .
> Similarly, Plaintiff proofread enrollment kits prepared by other [SSRs]. . . .
> Depending on the circumstances, Plaintiff either sent the enrollment kit to her co-
> worker via [e-mail] or printed a hard copy of the kit to provide to her co-worker
> for proofreading. Plaintiff provided a printed copy of the kit to her co-worker for
> proofreading where there was a significant amount of customization for the kit or
> when there were specific concerns about ensuring the kit was properly prepared
> for the customer. . . . Plaintiff was unable to estimate how often she delivered
> printed copies of enrollment kits to co-workers for proofreading versus sending
> copies via e-mail. . . . Rather, she made that determination based upon the
> individual customer's requirements. . . . There was no standard turnaround time in
> which the enrollment kits were required to be completed for delivery to the
> customer. . . . The turnaround time was simply dependent upon the customer's
> needs. . . . However, customers routinely required enrollment kits to be completed
> on an expedited basis. . . . [Williams] regularly interacted with her supervisor in
> order to complete her job duties. . . . The amount of interaction with her
> supervisor varied depending upon the customer and its specific needs. . . . Plaintiff
> also worked with other [SSRs] to jointly prepare enrollment kits. . . . [SSRs] also
> filled in for each other as needed, often under circumstances dealing with rush
> jobs for customers.

*Id*., pp. 3-6 (citing Williams Depo., pp. 31-51). Lincoln' argues that Williams could not perform

her job duties remotely, whether from home or some other location, given that she had to interact

with coworkers to complete her tasks. While Williams does not dispute that she interacted with

colleagues to prepare enrollment kits, she insists that Lincoln exaggerates the degree of

interaction required or that it *had* to be accomplished in person. Williams writes as follows:

> In her deposition, Plaintiff indicates that she worked with twenty (20) or more
> account managers on a regular basis. . . . Plaintiff states that some account
> managers worked "in Lincoln, various floors, various buildings." . . . Plaintiff also
> states that some account managers "worked from home." . . . With respect to *how*

Plaintiff interacted with these account managers, Plaintiff answered, "Via e-mail."
. . .

 Plaintiff described her job function during the deposition as follows:

I would make sure that information was entered into the system correctly,
proofread it for aesthetics, grammar. And then once my portion was done, I would
send the pdf over to the vendor so the vendor could print the enrollment kit so the
enrollment kits can be delivered on time for the employer's seminars or
conferences that they were having for the employees or for the new employees.

Plaintiff's Response, pp. 6-7 (citing and quoting Williams Depo., pp. 33-34). In other words,

"Plaintiff contends that the job consisted of processing information that was rarely reduced to

hard copy. . . . Plaintiff's deposition as noted above, reinforces her contention that the job was

primarily performed on a computer processing information available to any computer with access

to Defendant's system located virtually anywhere. . . . In fact, Plaintiff's deposition points out

that some of the account managers with whom Plaintiff interacted 'worked from home.'" *Id*., pp.

7-8. Williams argues that she could have performed her job duties from home and Lincoln's

refusal to allow her to do so therefore violated the ADA.

Lincoln argues that it is entitled to summary judgment for two reasons. First, Lincoln

contends that Williams' claims are "barred by the applicable limitations period . . . [because]

Plaintiff's request to work from home was denied in excess of 300 days prior to the filing of

Plaintiff's Charge of Discrimination with the [EEOC]." Defendant's Memorandum in Support, p.

1. Second, Lincoln argues that "the essential functions of Plaintiff's position could not be

performed from home. Rather, the job functions required Plaintiff to work from Lincoln's office,

just like every other Lincoln employee in the same position. As a result, Plaintiff's

accommodation request was not reasonable under the ADA." *Id*., pp. 1-2.

4

## STANDARD OF REVIEW

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Under Rule 56, the movant

has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id*. (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (e.g., produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [its] favor." *Id*. (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## DISCUSSION

### I. Limitations period.

Williams filed her Charge of Discrimination with the EEOC on February 29, 2016. Complaint, p. 4 (copy of EEOC charge). Lincoln notes that "300 days before that date is May 5, 2015. Thus, any failure to accommodate claim that accrued before May 5, 2015, is untimely." Defendant's Memorandum, p. 12.[3] Lincoln contends that Williams' claims are barred from the

---

[3] The ADA mandates that "[b]efore filing a lawsuit under the [statute], a plaintiff must file a charge of discrimination with the EEOC within 300 days of the discriminatory employment action." *Rose v. Franciscan All. Inc.*, 2018 WL 2688239, at *6 (S.D. Ind. June 4, 2018) (citing 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1); *Miller v. UPS*, 2008 U.S. Dist. LEXIS 3753, at *7-8, 2008 WL 151842 (S.D. Ind. Jan. 15, 2008)). "Failure to first present the discrimination claim to the EEOC bars the claim from court. Plaintiffs may bring claims for discriminatory conduct that occurred during the 300-day window stretching back from the date the EEOC

get-go because her "request that she be permitted to work from home as an accommodation was denied by Lincoln on March 17, 2015, or more than 300 days before she filed her EEOC charge, making her claim untimely." Defendant's Memorandum, p. 10 (citations omitted). Williams contends her claim was timely because even after her request was denied, she continued to pursue the matter until she resigned (or was constructively discharged) on June 18. Plaintiff's Response, pp. 8-9. In other words, Williams argues that the interactive process was ongoing even after March 17, 2015, but Lincoln continued to deny her requested accommodation, which she contends extends the filing deadline to 300 days from the date she was constructively discharged. Lincoln retorts by arguing that "[t]he Seventh Circuit has stated that, for purposes of the 300-day limitations period, the employer's discriminatory act occurs 'when *the defendant has taken the action that injures* the plaintiff and when the plaintiff knows she has been injured.'" Defendant's Reply (DE 35), p. 11 (quoting *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001) (italics in original)). Lincoln insists that the company "informed Plaintiff of its decision to deny her request to work from home in March 2015. Lincoln took no further *alleged* discriminatory action after this date. Although Plaintiff reiterated her request to work from home one day before her resignation–on June 17, 2015–she did not wait for a response from Lincoln before resigning on June 18, 2015." *Id.*, p. 11. Lincoln insists that Williams cannot claim that an ongoing interactive process (or more specifically, a breakdown in that process as a result of Lincoln's alleged intransigence) constituted a continuing violation that served to extend the deadline for

---

charge was filed, and thus, conduct falling outside this 300-day window is not actionable." *Id.* (citing *AMTRAK v. Morgan*, 536 U.S. 101, 113 (2002)).

filing a charge, and also that she "cannot use her 'constructive discharge' claim to make her charge timely." *Id*. Lincoln insists that even "assuming her alleged constructive discharge makes her charge timely, Plaintiff has set forth absolutely no evidence to support such a claim. Her mere assertion that she was constructively discharged is not enough to survive summary judgment." *Id*., p. 12 (citations omitted).

Lincoln cites numerous cases that support its position that Williams' EEOC charge was untimely, including *Dooley v. Abbott Labs*., 2009 WL 1033600, at *6 (N.D. Ill. Apr. 17, 2009) (plaintiff's failure to accommodate claims were time-barred because plaintiff could "pinpoint the exact date" the employer refused her accommodation request); *Fox v. Lear Corp.*, 327 F.Supp.2d 946, 952 (S.D. Ind. July 28, 2004) (statute of limitations begins to run when employer rejects employee's request); and *Mendez v. City of Chicago*, 2004 WL 29805982004, *4 (N.D. Ill. Dec. 22, 2004) (*employer's denial of employee's repeat request for previously denied accommodations does not constitute a new discriminatory act or make the previous denial part of a continuing violation*). *Id*., pp. 10-11 (italics added). Williams argues that the date of her alleged constructive discharge is the discriminatory event that triggered the 300-day limitation period; Lincoln argues that Williams misapplies the law and mischaracterizes the facts in an effort to extricate her claim from the limitations barrier into which it crashed.

Under Seventh Circuit precedent, two elements must be shown in a discriminatory discharge case to establish the date of an alleged unlawful employment practice. First, "'there must be a final, ultimate, non-tentative decision to terminate the employee.'"[4] *Purcell v. Indiana*

---

[4] It doesn't matter whether a plaintiff alleges discriminatory termination, a failure to accommodate or some other theory, since "[t]his test applies not only to termination decisions but to any 'unlawful employment practice.'" *Kaleta v. Nicholson*, 2008 WL 5386805, at *2 (N.D.

*Univ.-South Bend*, 2014 WL 4656565, at *3 (N.D. Ind. Sept. 17, 2014) (quoting *Flannery v.*

*Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004)). Second, "'the employer must

give the employee 'unequivocal' notice of its final termination decision.'" *Id.* Another district

court explained as follows:

> The 300-day period begins to run when there is a "final, ultimate, non-tentative
> decision" and the employer gives unequivocal notice of that decision. *See*
> *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004). A
> final decision remains final even if an employer later expresses a willingness to
> change that decision. *Id. Where the alleged wrong is a failure to accommodate,*
> *the failure is a discrete act of discrimination, not an ongoing policy that could*
> *justify application of the continuing violation theory to extend the violation*
> *through the entire period an accommodation is denied. See Teague v.*
> *Northwestern Mem. Hosp.*, 492 Fed.Appx. 680, 684 (7th Cir. Aug. 23, 2012)
> (citing *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 130-31 (1st Cir. 2009);
> *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 368
> (D.C.Cir. 2007); *Proctor v. UPS*, 502 F.3d 1200, 1210 (10th Cir. 2007); *EEOC v.*
> *Graphic Packaging Int'l, Inc.*, No. 12 C 6371, 2013 WL 3321606, *2 (N.D.Ill.
> July 1, 2013)).

*McVey v. S. Illinois Univ.*, 2013 WL 6632009, at *6 (S.D. Ill. Dec. 16, 2013) (italics added).

"Notice is *not* unequivocal if the employee is unsure of his employment status after receiving the

notice. *See Dvorak* [*v. Mostardi Platt Assocs., Inc.*], 289 F.3d [479,] 486 [(7th Cir. 2002)]

(stating that plaintiff's request for clarification as to his employment status tends to show that any

notice he might have received of his termination was not all that unequivocal)." *Powell v. United*

*Ins. Co.*, 2006 WL 1674463, at *8 (E.D. Wis. June 16, 2006).

In this case, it is undisputed that Lincoln expressly told Williams on March 17, 2015, that

"it is essential for you to be in the office and your request to work from home is denied."

---

Ill. Dec. 22, 2008) (citing *Smith v. Potter*, 445 F.3d 1000, 1007 (7th Cir. 2006)).

Defendant's Memorandum, Exh. (DE 28-4), p. 3 (email from Audrey Thompson to Williams).[5]

After Williams again demanded the same accommodation in her March 27 email, Thompson responded on April 16, reiterating Lincoln's position that "[a]s it relates to your discussions with your manager and your continued requests to work from home or remotely, I have explained in my prior email that it is essential for you to perform your functions here in the office." *Id.*, p. 4. Those statements are about as unequivocal as they can be, but Williams ignores them and focuses instead on Lincoln's statements in both of Thompson's emails indicating a willingness to investigate alternative accommodations. She argues that despite that pledge, Lincoln never offered or provided any accommodation (although in her email of April 16, Thompson did refer to the possibility of Williams applying for other positions in the company that might permit her to work from home, even though those jobs admittedly had a "ramp-up" period that would require Williams to work in the office for many months) and therefore acted in bad faith during the interactive process, forcing her into a constructive discharge, which in turn extends the deadline for her to file her EEOC charge to 300 days from June 18, 2015.

What Williams attempts to characterize as Lincoln's continuous and repeated refusals *to accommodate* her were really just refusals *to reconsider* its initial denial of her request. Therefore, even assuming for the sake of argument that Lincoln's decision on March 17, 2015, to deny Williams' accommodation request was discriminatory, the company's subsequent refusals to reverse course would not constitute additional discriminatory acts that would extend the statutory limitations period. As the Seventh Circuit expressly stated in *Sharp*, "'[a]n employer's refusal to undo a discriminatory decision is not a fresh act of discrimination.'" *Sharp*, 236 F.3d

---

[5] Audrey Thompson is a Senior Human Resources representative at Lincoln.

at 373 (quoting *Lever v. Northwestern Univ.*, 979 F.2d 552, 556 (7th Cir. 1992)). The appellate court also concluded in *Sharp* that the defendant's "subsequent refusal to reconsider [its initial] decision does not constitute a separate act of discrimination and cannot bring Ms. Sharp's claims within the 300-day statute of limitations." *Id*. In the present case, Lincoln denied Williams' accommodation request on March 17 and reaffirmed that decision on April 16. Lincoln's expressed willingness to investigate other options, even though the parties never reached agreement, does not turn its unequivocal denial into a continuing violation. Accordingly, Williams' charge was filed outside the 300-day limitations period and is barred.

### A. The interactive process.

As stated above, Williams attempts to formulate an argument to rescue her untimely claim by contending that, notwithstanding Lincoln's unequivocal denials of her request, the company acted in bad faith during the interactive process and it was that bad faith that forced her to quit. Williams contends that Lincoln's March 17, 2015, denial of her request to work from home "was one part of a larger 'interactive process' which culminated in Plaintiff's constructive discharge." Plaintiff's Response, p. 1, n. 1. More specifically, according to Williams "it is [Lincoln] that failed to 'engage in the interactive process' resulting in a failure to satisfy [its] obligations under the ADA." *Id*., p. 6 (citing *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 953 (8th Cir. 1999) ("[S]ummary judgment is typically precluded when there is a genuine dispute as to whether the employer acted in good faith and engaged in the interactive process of seeking reasonable accommodations."). This is a proper statement of the law, even in the Seventh

Circuit,[6] but it doesn't help Williams since the facts and evidence clearly show the contrary–that Lincoln engaged in the interactive process in good faith in an effort to find a reasonable accommodation that would allow Williams to perform her job.

A closer look at how events transpired reveals the flaws in Williams' arguments. Williams concedes that "Ms. Thompson informed Plaintiff on March 17, 2015, that working from home was not approved but 'she was open to exploring alternative accommodations.'" Plaintiff's Response, p. 9. On March 27, 2015, Williams sent an email to Thompson in which she reiterated her desire to work from home or another remote location. Defendant's Memorandum,

---

[6] In *E.E.O.C. v. Sears, Roebuck & Co.*, the Seventh Circuit explained as follows:

According to an EEOC regulation, the purpose of the interactive process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). This step imposes a duty on employers to engage in a flexible give-and-take with the disabled employee so that together they can determine what accommodation would enable the employee to continue working. *Gile* [*v. United Airlines, Inc.*], 213 F.3d [365,] 373 [(7th Cir. 2000)]. If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown:

No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck* [*v. Univ. of Wisconsin Bd. of Regents*], 75 F.3d [1130,] 1135 [(7th Cir. 1996].

*E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005).

Exh. B, Part 3 (DE 28-4), pp. 5-6. Also in that email, Williams asked Thompson whether there had "been any signs of mold in the [Lincoln office] buildings[]" and whether "[d]uring the last 4 years . . . [there have] been any renovations in [those buildings[.]" *Id*. Thompson responded on April 16 and advised that Lincoln's "Facilities [department has] advised me that there are currently no signs of mold in either building[]" and that "[n]o renovations have been conducted in your area in the past four years." *Id*., p. 4. Thompson added that "Our HVAC techs did a check of the area and have found no areas for concern." *Id*. In that same email, Thompson reiterates Lincoln's position that "it is essential for you to perform your functions here in the office. Your work requires hands on review of materials that are not delivered to us on a regular basis." *Id*. Thompson also asked Williams to provide additional medical information "so we can understand what your allergens are and/or alternative ways to potentially accommodate you. You have provided us with no specifics other than that you have a reaction to something which you believe is in the working environment, but cannot pinpoint what in Lincoln's environment is causing the reaction. . . . Therefore to fully explore your request and any accommodations we need to have a much more complete understanding of what is causing your symptoms." *Id.* Finally, Thompson informed Williams that "I have taken the liberty of exploring open positions for which you may apply that might allow you to work from home, however, please also understand that those positions require a ramp up period during which you must be physically at work and demonstrating your capability to understand and perform the roles before you could work from home. This ramp up period is generally a minimum of 12 months." *Id*. It is undisputed that Williams did not submit any additional paperwork or medical documentation. The next communication was Williams' June 17 email in which she reiterated that "I desire to work from

13

home." Complaint, pp. 25-26. Twenty five hours later, before receiving any response from Lincoln, Williams sent another email in which she stated: "Since I have not yet heard back from any one regarding working from home on a trial basis, and my health issues have brought me to a breaking point (I can no longer risk further deterioration of my health), please consider this email as my resignation effective tomorrow, Friday, June 19th." *Id.*, p. 7. Lincoln fleshes out the facts by noting that "[o]n June 17, 2015, Plaintiff emailed Ms. Thompson 'to reiterate' that she 'desired to work from home' and asked that they 'come to an agreement' to allow her to work from home on a trial basis by Monday, June 22. . . . The very next day, June 18, 2015, Plaintiff resigned her employment with Lincoln via email." *Id.* (citing Williams Depo., pp. 124-26; Depo. Exh. 9).

Williams seizes on Lincoln's statement that it was "open to exploring alternative accommodations," then insists that the company acted in bad faith simply because the parties never came to an agreement on an accommodation before Williams resigned. In other words, according to Williams, after Lincoln denied her request and expressed a willingness to explore alternatives, it nonetheless "refused to make reasonable accommodation of her disability in that Defendant refused to allow her to 'work from home or a remote location' and took no alternative steps to address the environmental causes of her allergic reactions." *Id.*, p. 1. So because Lincoln did not grant her request, or agree to reverse course, she had no choice but to resign, and her alleged constructive discharge on June 18 was the discriminatory act that triggered the 300-day limitations period.

Williams' argument is convoluted and requires more than one leap in logic, but she summarizes it as follows:

14

On June 17, 2015, Plaintiff continued to engage in the interactive process by asking if a trial period of working from home might be acceptable. . . . Having received not a single offer of accommodation or even a suggested alternative to working from home from Defendant since first informing Defendant of her disability at some point in 2014, Defendant was finally forced into a constructive discharge on June 18, 2015. . . . [T]he discrete act of Plaintiff's constructive discharge [means] Plaintiff's EEOC charge was timely filed within the 300-day requirement.

*Id*., pp. 9-10.

Lincoln insists that Williams' argument is "based on mischaracterizations of the law, facts, or both." Defendant's Reply, p. 1. This is not too harsh a criticism, especially with regard to Williams' presentation of the facts regarding Lincoln's participation in the interactive process, many of which she "spins" and most of which she ignores. As to the law, the flaw in Williams' arguments is not so much that she mischaracterizes it, but that she conflates the law concerning the interactive process requirement, the continuing violation doctrine and the constructive discharge doctrine to argue that Lincoln's refusal to reverse its denial of her request constituted a continuing violation against her and, therefore, the date of her constructive discharge is the date that triggered the 300-day limitations period. Lincoln replies by stating that "Plaintiff argues that her failure to accommodate claim was not a 'discrete act' because she alleges Defendant failed to engage in the interactive process. Although not explicitly stated, Defendant understands that Plaintiff is arguing that the continuing violation doctrine applies to Plaintiff's failure to accommodate claim." But as Lincoln correctly points out, the continuing violation doctrine has no applicability in this case. Lincoln writes that "[i]n *Teague v. Northwestern Mem. Hosp.* . . . the Seventh Circuit held that 'a refusal to accommodate claim is a discrete act–not an ongoing omission–and therefore the continuing violation doctrine does not apply' and cited several other

circuit opinions to support this conclusion." Defendant's Reply, pp. 9-10 (quoting *Teague*, 492

F.Appx. 680, 684 (7th Cir. 2012)). Lincoln cites additional cases, including one from this court,

that "likewise held that the failure to accommodate is a discrete act." *Id.*, p. 10 (citing *Harding v.*

*Cent. Transp. LLC*, 2017 WL 1048289 * (N.D. Ind. March 20, 2017); *Dooley v. Abbott Labs.*,

2009 WL 1033600 *6-7 (N.D. Ill. April 17, 2009)). In *Harding*, this Court explained as follows:

> [A] refusal to provide a reasonable accommodation is a "discrete act" and "not an
> ongoing omission." *Teague*, 492 Fed.Appx. at 684 (holding this and citing other
> circuits that have held the same); DeLon, 990 F. Supp. 2d at 871. Thus, in the case
> at hand, Harding may only base his ADA claim on some discrete act that Central
> Transport took when it (allegedly) refused to accommodate plaintiff's injury. He
> may not base his claim on Central Transport's continuing lack of accommodation
> after the refusal. *See Stepney*, 392 F.3d at 240 ("We have made clear, however,
> that failure to remedy an unlawful employment action is not a discrete actionable
> violation.").

*Harding*, 2017 WL 1048289, at *2. The result was the same in *Dooley*, where the court found

that the employer's denial of the plaintiff's request for a modified work schedule "was a discrete

discriminatory act that triggers the 300 day limitations period[]" since the exact date of that

denial was ascertainable. *Dooley*, 2009 WL 1033600 at *6 (citing *Kielbasa v. Ill. Envtl.*

*Protection Agency*, 2003 WL 880995, at *4 (N.D. Ill. Mar. 3, 2003) ("An employer's refusal or

inaction to undo an allegedly discriminatory decision is not a fresh act of discrimination.");

accord, *Lever v. Northwestern Univ.*, 979 F.2d 552, 556 (7th Cir. 1992) ("when . . . a single

discriminatory decision is taken, communicated, and later enforced despite pleas to relent[,] the

[limitations period] starts with the initial decision.")).

Lincoln is correct that Williams' legal arguments are flawed and the factual foundation on

which she constructed them is unsupported, and in fact debunked, by the evidence. She cannot

invoke the continuing violation doctrine to extend the limitations period and her argument that

Lincoln failed to engage in the interactive process is unsupported by the facts. (Her constructive discharge claim suffers from lack of support in both law and fact, as discussed later.)

Williams' contention that Lincoln failed to engage in the interactive process, or that it did so in bad faith, is belied by the evidence. Her argument is refuted by the evidence presented by Lincoln, particularly the emails between Williams and Thompson, and she presents no contrary evidence of her own. The ADA requires "'both employer and employee to engage in a flexible, interactive process'" and that '[b]oth parties are responsible for that process.'" *Rose v. Franciscan All. Inc.*, 2018 WL 2688239, at *8 (S.D. Ind. June 4, 2018) (quoting *Brown v. Milwaukee Bd. of School Directors*, 855 F.3d 818, 821 (7th Cir. 2017)). The goal of the process, of course, is to encourage an employer and employee to work together to identify a reasonable accommodation that will permit a disabled employee to perform her job. Williams claims she was engaging in the interactive process but Lincoln wasn't, instead digging in its heels and refusing to grant her requested accommodation. The latter part is true–Lincoln never reversed course on its initial denial on March 17 nor indicated any willingness to do so. But as the many cases discussed above show, that refusal to reverse its denial is not the same as a refusal to engage in the interactive process. Anyway, the evidence shows that Lincoln did engage in the process and expressly stated its intention to continue to do so even after twice denying Williams' *preferred* accommodation request. Thompson's April 16 email "reiterating that working from home was not an acceptable accommodation" was, on its face, a refusal to reconsider its previous decision, not a refusal to consider other options.

Williams' argument regarding the interactive process is doomed for another reason, too. That is because "it is also well established that [an employer's] failure to complete the interactive

process . . . does not mean that [the plaintiff] is entitled to prevail as a matter of law. The failure

by an employer 'to engage in the interactive process required by the ADA is not an independent

basis for liability under the statute, and that failure is actionable only if it prevents identification

of an appropriate accommodation for a qualified individual.'" *Kottke v. PetSmart, Inc.*, 2018 WL

3329698, at *3 (N.D. Ill. July 6, 2018) (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034,

1039 (7th Cir. 2013)); *see also*, *Hendon v. Wisconsin Bell, Inc.*, 2018 WL 1885678, at *5, n. 3

(E.D. Wis. Apr. 19, 2018) ("The failure to engage in the interactive process required by the ADA

is not an independent basis for liability under the statute, and that failure is actionable only if it

prevents identification of an appropriate accommodation for a qualified individual.") (citing

*Basden*, 714 F.3d at 1039).

As this Court noted recently, the Seventh Circuit summarized the interactive process as

follows:

> Upon receiving an accommodation request, an employer is not required to provide
> the exact accommodation requested. [*E.E.O.C. v.*] *Sears*, 417 F.3d [789,] 802
> [(7th Cir. 2005)]. Instead, "the ADA obligates the employer to engage with the
> employee in an interactive process to determine the appropriate accommodation
> under the circumstances." *Id*. at 805 (internal quotation marks omitted). This
> process brings the employee and employer together in cooperation to "identify the
> employee's precise limitations and discuss accommodation which might enable
> the employee to continue working." *Gile v. United Airlines, Inc.*, 213 F.3d 365,
> 373 (7th Cir. 2000). "If this process fails to lead to reasonable accommodation of
> the disabled employee's limitations, responsibility will lie with the party that
> caused the breakdown." *Sears*, 417 F.3d at 805.

*Hizer v. S. Bend Tribune*, 31 F.Supp.3d 986, 993-94 (N.D. Ind. 2014) (quoting *Cloe v. City of*

*Indianapolis*, 712 F.3d 1171, 1178 (7th Cir. 2013)); *see, e.g., Zieba v. Showboat Marina Casino*

*P'ship*, 361 F.Supp.2d 838, 844-45 (N.D. Ind. 2005) (fact issue whether employer engaged in

interactive process in good faith when it fired plaintiff shortly after he informed employer of his

disability, employer's alleged attempts to identify reasonable accommodation "do[] not appear to have been very thorough or to have included input from [plaintiff]," and "plaintiff's attempts to contact the company and find a solution were met with little response.").

The evidence shows that Lincoln and Williams engaged in discussions concerning her disability and how to accommodate it. Throughout the process, Lincoln refused to reverse its March 17 decision but repeatedly stated that it was open to discussing other possible accommodations. Williams was equally entrenched, though, in her position that the only reasonable accommodation was to allow her to work from home or another remote location. Finally, on June 18, 2015, Williams apparently abandoned hope that her request would be granted and resigned for that reason. In fact, as Lincoln contends, "[i]f anyone caused a breakdown in the interactive process it was *Plaintiff*, not Lincoln, as she refused to provide any additional medical documentation and resigned her employment when Lincoln would not provide her with the (unreasonable) accommodation of working from home." Defendant's Reply, p. 5. The Court concludes that Lincoln engaged in the interactive process in good faith and Williams' attempt to argue to the contrary is unsupported by the undisputed evidence. Accordingly, Williams' argument that Lincoln's refusal to change its decision constituted bad faith, or her implied argument that that refusal was part of a continuing violation which in turn extended the limitations period, is unavailing.

### B. Constructive discharge.

Given that Williams' charge of discrimination was filed outside the 300-day limitations period, the Court seemingly would have no jurisdiction nor any reason to discuss the merits of either Williams' failure to accommodate claim or her constructive discharge claim. However,

given that Williams argues that her alleged constructive discharge was the triggering event for limitations purposes, the Court must address the merits of that claim (or rather lack thereof) in that context. Lincoln argues that Williams cannot establish a constructive discharge claim in the first place and therefore cannot rely on it for purposes of extending the limitations period:

> [A]ssuming her alleged constructive discharge makes her charge timely, Plaintiff has set forth absolutely no evidence to support such a claim. Her mere assertion that she was constructively discharged is not enough to survive summary judgment. *See de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008) ('A nonmoving party cannot defeat a motion for summary judgment with bare allegations.')[.] Plaintiff must set forth specific facts–supported by record evidence–that would allow a jury to conclude that her workplace conditions were so intolerable that a reasonable person would have been compelled to resign. Plaintiff has completely failed to do so.

*Id.*, p. 12. Lincoln cites numerous cases to support its argument that the facts of this case do not support Williams' constructive discharge allegation. *Id.* (citing *Sansone v. Donahoe*, 98 F.Supp.3d 946, 956 (N.D. Ill. 2015)) (no constructive discharge claim where employer expressed willingness to explore accommodations but employee resigned anyway)[7]; *Reberg v. Road Equipment*, 2005 WL 3320780 (N.D. Ind. Dec. 7, 2005) (no constructive discharge claim because plaintiff's assertions did not establish the level of "shocking" or "outrageous" conditions necessary for constructive discharge claim); *Pagliaroni v. Daimler Chrysler Corp.*, 2006 WL 2668157, at *10 (E.D. Wis. Sept. 15, 2006) ("Pagliaroni essentially claims that she was constructively discharged because DC failed to accommodate her disability. Pagliaroni has failed to establish how the defendant's alleged failure to accommodate has exceeded ordinary

---

[7] The court in *Sansone* explained that "At the time Sansone resigned from his position, the [defendant employer] expressed a willingness to continue discussing . . . accommodations. Even if Sansone felt that those were half-hearted offers, a reasonable person would not have felt that his only option at that point was to resign." *Sansone*, 98 F. Supp. 3d at 956.

discrimination under the ADA. She has not presented evidence that is more egregious in nature than the alleged conditions she was subjected to previously. Therefore, DC is entitled to summary judgment regarding Pagliaroni's claim of constructive discharge.").

It is well established, as the Seventh Circuit has explained, that a constructive discharge claim is "'limited to egregious cases' and 'occurs when an employee resigns because working conditions are so intolerable that a reasonable employee would feel compelled to quit[.]'" *Roake v. Forest Pres. Dist. of Cook Cty.*, 849 F.3d 342, 347 (7th Cir. 2017) (quoting *Lifton v. Bd. of Educ. of City of Chic.*, 416 F.3d 571, 578 (7th Cir. 2005)); *see also Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1035-36 (7th Cir. 2006), partially overruled on other grounds by *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013) ("Working conditions for constructive discharge must be even more egregious than those that would support a finding of a hostile work environment."). "The 'working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress.'" *Kovalevska v. Burlington Coat Factory of Indiana, LLC*, 2018 WL 3036423, at *5 (S.D. Ind. June 19, 2018) (quoting *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004). "'In order to show that a hostile work environment resulted in her constructive discharge, [the plaintiff] must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that her resignation was an appropriate response.'" *Id.* (quoting *McPherson*, 379 F.3d at 440). And this Court also recently explained as follows:

> Constructive discharge occurs when an employee's job becomes so unbearable that a reasonable person in that employee's position would be forced to quit. *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009). The standard for establishing constructive discharge is extremely high; the situation must be "even more

egregious than that needed for a hostile work environment" claim. *Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 864 (7th Cir. 2011). Further, the working conditions that caused the constructive discharge must be intolerable in a discriminatory way. No matter how "horrific the conditions," plaintiff must put forth evidence showing that the conditions were inflicted upon him because of his protected trait. *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 517 (7th Cir. 1996). Additionally, "[a] constructive discharge claim requires evidence that quitting was the only way the plaintiff could extricate [him]self from the intolerable conditions." *Gawley v. Ind. Univ.*, 276 F.3d 301, 315 (7th Cir. 2001).

*Simelton v. Pilot Flying J*, 2018 WL 1566828, at *4 (N.D. Ind. Mar. 29, 2018).

The Court has no reason to doubt the seriousness of Williams' health condition or her assertions that it impaired her ability to perform her job (at least at the office). And her condition may indeed have become so acute as of June 18 that she felt compelled to resign; but that is a far cry from being *forced* to do so as a result of Lincoln's refusal to reconsider her request to work from home.[8] Williams presents no evidence to support her contention that her working conditions became "intolerable in a discriminatory way." Williams' frustration about her condition and its effect on her ability to continue working at Lincoln is palpable both in her brief and her resignation letter, as is her frustration over Lincoln's refusal to reverse its decision denying her request to work from home. That said, the facts of this case do not support Williams' conclusory assertion that she was constructively discharged. Accordingly, she cannot argue that her resignation was a discrete discriminatory act that served to trigger the 300-day limitations period on her ADA claim.

---

[8] Williams concedes in her March 27 email to Thompson that she had other options she could utilize if she needed time off to manage her health issues. She states that "Yes, I can take [leave under the] FMLA or [Short Term Disability], but that is just a temporary solution." (DE 28-4), p. 6. Obviously, Williams did not take advantage of either option, choosing instead to resign her position on June 18, thereby also terminating the interactive process.

**CONCLUSION**

For the reasons discussed above, the Motion for Summary Judgment filed by Defendant

Lincoln Financial Group (DE 27) is GRANTED.


Date: July 23, 2018.

/s/   William C. Lee<br>
William C. Lee, Judge<br>
U.S. District Court<br>
Northern District of Indiana